675 A.2d 1094

ROBERT N. BARRATT, PLAINTIFF–RESPONDENT, v.
CUSHMAN & WAKEFIELD OF NEW JERSEY,
INC., DEFENDANT–APPELLANT.

Argued March 26, 1996—Decided May 13, 1996.

. *Donna duBeth Gardiner* argued the cause for appellant (*Robinson, St. John & Wayne,* attorneys; *Ms. Gardiner* and *Thomas D. Ruane,* on the briefs).

*Frederick E. Gerson,* Florham Park, for respondent (*D'Alessandro & Jacovino,* attorneys).

The opinion of the Court was delivered by

POLLOCK, J.

This case raises two issues concerning the construction of the Conscientious Employee Protection Act, *N.J.S.A.* 34:19–1 to –8 (CEPA). The first issue is whether a minority partner in a real estate partnership can constitute "another employer with whom there is a business relationship" within the meaning of *N.J.S.A.* 34:19–3a. The second is whether the business relationship will sustain an action for a retaliatory discharge if the relationship existed at the time of the discharged employee's disclosure of the illegal act of the other employer, but not at the time of the

occurrence of the illegal act. We answer both questions in the affirmative.

Plaintiff, Robert N. Barratt, sued his former employer, Cushman & Wakefield of New Jersey, Inc. (Cushman & Wakefield), a commercial real estate broker, for a retaliatory discharge resulting from Barratt's disclosure to the New Jersey Real Estate Commission (the Commission) that William Schaffel may have participated in commercial bribery seven years earlier. At the time of Barratt's discharge, Cushman & Wakefield was the exclusive leasing agent for a partnership known as Exchange Place Urban Renewal Associates (Exchange Place), which owned a commercial building in Jersey City. Schaffel's interest in the partnership was less than twenty percent.

The Law Division granted Cushman & Wakefield's motion for summary judgment dismissing Barratt's claim for a CEPA violation. The Appellate Division reversed, holding that Schaffel could constitute another employer with whom Cushman & Wakefield had a business relationship and that the existence of the relationship at the time of Barratt's disclosure to the Commission sufficed to sustain Barratt's claim for a retaliatory discharge. We granted Cushman & Wakefield's petition for certification, 143 *N.J.* 321, 670 *A.*2d 1063 (1995), and now affirm.

-I-

On November 15, 1978, Barratt signed a "Broker–Salesperson Employment Contract" with Cushman & Wakefield. Paragraph four of the contract incorporated "the written policies, rules, regulations, and office procedures of [Cushman & Wakefield]." The Cushman & Wakefield employment manual provided:

Employees should not discuss any matters concerning, or in any way relating, to C & W [Cushman & Wakefield] business with representatives of administrative and investigative agencies, e.g., ... Real Estate Commission; or any other governmental agencies or with any attorneys or insurance company personnel representing adversaries or potential claimants against [C & W] or our client, without the prior approval of the Legal Department.

Paragraph 8(a) of the employment contract stated:

In the event any transaction in which Employee is involved results in a dispute, arbitration, litigation or legal fee or expense, Employee shall cooperate fully with C & W and C & W and Employee shall share any fees, expenses, settlements and judgments, in connection therewith in the same proportion as they would normally share the commission or fee resulting from such transaction, provided, however, if in the course of performing his services for C & W in accordance with the terms of this Agreement, Employee, C & W and Employee, or C & W is made a party defendant in any litigation, arbitration, or other legal proceeding, and provided Employee has not exceeded his authority or otherwise acted contrary to the terms of this Agreement with respect to the matter involved, then C & W shall indemnify, defend and hold Employee harmless from any loss, liability, damages, costs and expenses, including attorney's fees, in excess of Employee's share of the commission or fee received or to be received by Employee relating to the matter in dispute.

Finally, paragraph ten of the employment contract provided in part:

In the event any legal action or proceeding is commenced to interpret or enforce the terms of or obligations arising out of this Agreement, or to recover damages for the breach thereof, the party prevailing in any such action or proceeding shall be entitled to recover from the non-prevailing party all reasonable legal fees, costs and expenses incurred by the prevailing party.

In 1982, Cushman & Wakefield entered an agreement to act as the exclusive broker for Connell Rice & Sugar Co., Inc. (Connell) in the rental of a large commercial building in Berkeley Heights. Barratt actively sought to lease the property on behalf of Cushman & Wakefield. Through Schaffel, a competing broker, and others, Connell signed a ten-year lease with AT & T Technologies for $71,429,388.40.

In an ensuing civil action, Cushman & Wakefield obtained a judgment against Schaffel and others for $3,821,469.42 compensatory damages and $1,250,000 punitive damages. Specifically, the jury found that Schaffel had tortiously interfered with the exclusive contract between Cushman & Wakefield and Connell and with Cushman & Wakefield's prospective economic advantage.

The Appellate Division affirmed in an unreported opinion. Both parties filed petitions for certification, which this Court denied on October 10, 1990. 122 *N.J.* 390, 585 A.2d 391, 392 (1990). Ultimately, the defendants paid Cushman & Wakefield $5,535,632.40,

from which Cushman & Wakefield paid Barratt $1,107,126.48, less $157,379.11, representing Barratt's share of the legal fees.

While the petitions for certification were pending in this Court, Barratt drafted a letter dated July 5, 1990, to the Commission to inform it of "a decision of the Appellate Division ... affirming a jury verdict which found that William D. Schaffel (broker) and Benedict Torcivia (salesperson) were guilty of conspiracy and commercial bribery and that both participated in a pay off (a commission) to a person ... not a broker."

Barratt submitted his proposed letter to Cushman & Wakefield's attorney, Steven A. Sandberg. Concerned that Barratt's letter would jeopardize the brokerage relationship with the partnership, Sandberg directed Barratt not to send it. Sandberg sent a confirming memorandum of July 10, 1990, stating: "As I informed you, neither you nor your attorney are [sic] authorized to make such communication on behalf of Cushman & Wakefield. If and when the proper time for the communication arises, that will be a decision made by the firm."

Barratt, who was about to undergo heart surgery, gave a copy of his letter to his attorney, Edward D'Alessandro, with instructions to send the letter to the Commission if Barratt died. Barratt survived the surgery. At one point, Barratt said that he did not remember sending the letter. Someone, however, sent it to the Commission, and the Commission sent Barratt a letter acknowledging receipt. Later, Barratt acknowledged he

> feels that it is possible that he may have left the original letter at his office and that his secretary, unbeknownst to him, may have mailed the letter to the New Jersey Real Estate Commission or, that in a moment of extreme stress, he may have inadvertently mailed that letter to the New Jersey Real Estate Commission.

While Barratt was on medical leave, Schaffel learned that the Commission had received the letter. Schaffel complained to Cushman & Wakefield. On August 2, 1990, Barratt's counsel wrote to the Commission requesting withdrawal of the complaint. The Commission, however, proceeded. In response to a letter of January 25, 1991, from the Commission, Schaffel, without admit-

ting his guilt, paid a $1,000 administrative penalty to the Commission.

In the interim, on August 17, 1990, Sandberg sent Barratt a memorandum informing him, "[t]his action on your part constitutes gross insubordination and a wanton violation of the terms of your employment...." On September 27, 1990, Cushman & Wakefield discharged Barratt and sent him a confirming memorandum, stating: "Per our discussion this morning, you are hereby terminated for cause as per [counsel's] memo to you...."

Barratt filed a multi-count complaint against Cushman & Wakefield. The relevant counts alleged that Cushman & Wakefield violated CEPA by dismissing him in retaliation for his letter to the Commission; that Cushman & Wakefield dismissed him in violation of the Law Against Discrimination (LAD), *N.J.S.A.* 10:5–1 to –42, because of his heart condition and age, sixty-two; in violation of public policy and the common law; and in violation of his employment contract, which required two weeks notice. He also alleged that he was entitled to disability benefits arising from his heart attack and that he had not received his full share of the proceeds of the earlier civil action against Schaffel. Underlying the last claim was the contention that Cushman & Wakefield had deducted not only Barratt's proportionate share of the attorney's fees related to the claim for a commission, but also a share of the fees attributable to the defense of Schaffel's counterclaim charging antitrust violations.

Of particular relevance to this appeal, the Law Division granted Cushman & Wakefield's motion for summary judgment dismissing Barratt's claims for retaliatory discharge under CEPA and the common law. On the remaining claims, the jury found that Cushman had good cause for dismissing Barratt and that his dismissal did not violate the LAD. The only claim on which the jury found for Barratt was that for disability benefits arising from his heart attack.

While the jury was deliberating, the trial court determined that Cushman & Wakefield properly had charged Barratt with a

portion of the litigation expenses attributable to the defense of Schaffel's antitrust counterclaim in the earlier proceeding.

Thereafter, Cushman & Wakefield applied for attorney's fees. It based its application on the terms of the employment contract; the LAD, which authorizes the allowance of reasonable attorneys' fees to a party that has successfully defended against discrimination claims if "the charge was brought in bad faith," *N.J.S.A.* 10:5–27.1; and on CEPA, which authorizes the award of reasonable attorneys' fees to an employer "if the court determines that an action brought by an employee under this act was without basis in law or in fact." *N.J.S.A.* 34:19–6. For the defense of the claims under the employment contract, including claims not otherwise relevant to this appeal, the court awarded Cushman & Wakefield $187,181.58 for attorneys' fees and $30,784.60 for disbursements; $75,727.60 for attorneys' fees for defense of the LAD claim; and $18,524.43 for attorneys' fees in defending the CEPA claim.

In reversing the Law Division's dismissal of the CEPA claim, the Appellate Division also ruled that CEPA, *N.J.S.A.* 34:19–8, preempted Barratt's common-law claim for retaliatory discharge. The Appellate Division found further that the amounts awarded for attorneys' fees were reasonable. It continued, however, that the award of attorneys' fees to the "prevailing party," on the contract claim should await the outcome of the resolution of that claim. The court also stated that to sustain an award of attorneys' fees to Cushman & Wakefield under CEPA, the Law Division must first find that Barratt's action "was without basis in law or in fact." *N.J.S.A.* 34:19–6. Concerning the attorneys' fee awarded on the LAD claim, the Appellate Division stated that the Law Division must find " 'that the [discrimination] charge was brought in bad faith.' *N.J.S.A.* 10:5–27.1."

-II-

Ten years ago, the Legislature adopted CEPA. In CEPA the Legislature codified this Court's ruling in *Pierce v. Ortho Pharmaceutical Corp.*, 84 *N.J.* 58, 72, 417 *A.*2d 505 (1980), which

protected employees against discharges that violated a clear mandate of public policy. The purpose of CEPA is to protect employees who report illegal or unethical work-place activities. So viewed, CEPA is remedial legislation. Consequently, courts should construe CEPA liberally to achieve its remedial purpose. *Abbamont v. Board of Educ.*, 138 *N.J.* 405, 431, 650 *A.*2d 958 (1994).

Specifically, CEPA prohibits an employer from taking retaliatory action against an employee who discloses to a public body an activity of an employer "that the employee reasonably believes is in violation of a law, or a rule or regulation promulgated pursuant to law." *N.J.S.A.* 34:19–3a. Barratt perceived that Schaffel had violated a rule of the Commission. For the purposes of withstanding Cushman & Wakefield's motion for summary judgment, we conclude that CEPA protects Barratt's conduct in reporting the alleged violation to the Commission.

Because this appeal arises from the grant of a summary judgment in favor of defendant, Cushman & Wakefield, we give plaintiff the benefit of all inferences that may be drawn in his favor. *R.* 4:46–2; *Pierce, supra,* 84 *N.J.* at 61, 417 *A.*2d 505. So viewed, the record reveals that Schaffel is a partner in Exchange Place, Cushman & Wakefield is the partnership's leasing broker, Barratt reported to the Commission Schaffel's illegal conduct of seven years ago, and that Cushman & Wakefield fired Barratt in retaliation for sending the letter and to protect its business relationship with Schaffel's partnership.

The initial question is whether CEPA protects an employee who reports an illegal act of a partner in a partnership that has a business relationship with the employee's employer. *Finston v. Unemployment Compensation Comm'n,* 132 *N.J.L.* 276, 39 *A.*2d 697 (Sup.Ct.1944), *aff'd sub nom Naidech v. Unemployment Compensation Comm'n,* 134 *N.J.L.* 232, 46 *A.*2d 734 (E. & A. 1946), on which Cushman & Wakefield relies, is irrelevant. In that case, the court held that a partnership that had common partners with a second partnership was not liable to the unemployment compensa-

tion fund for the obligation to the fund of the second partnership. That issue is distinguishable from the issue before us, whether CEPA covers Barratt's otherwise protected disclosure about Schaffel, a partner in a partnership with which Cushman & Wakefield had a business relationship. CEPA's emphasis on protecting an employee, such as Barratt, from a retaliatory discharge likewise distinguishes Barratt's situation from attempts to hold a partnership liable for the wrongs of individual partners. *See N.J.S.A.* 42:1-9; 42:2A-27 (stating that partnership not liable for acts of individual partners taken without partnership's acquiescence). The issue of Exchange Place's liability for Schaffel's acts is not before us.

As originally enacted, CEPA protected an employee from retaliatory action for a disclosure about "an activity, policy or practice of the employer. . . ." *L.* 1986, *c.* 105, § 3a. In 1989, the Legislature extended CEPA to protect employees from retaliation for disclosure about such an activity, policy or practice of "another employer, with whom the employee's employer has a business relationship. . . ." *L.* 1989, *c.* 220, § 1. Assembly Labor Committee Statement No. 661 explained the legislative purpose:

> Under current law, an employee is protected against retaliation only with regard to the disclosure or threatened disclosure of information about his employer and public policies concerning the health, safety or welfare of the public. These protections are available to the employee, though, only if the employee brings the unlawful activity, policy or practice to the attention of the employer, and provides the employer with a reasonable opportunity to correct the unlawful activity, policy or practice.
>
> *The aim of the bill is to discourage collusion between employers for the purpose of inhibiting disclosure by their employees of violations of law committed by either employer.*
>
> [*L.* 1989, *c.* 220 (emphasis added).]

Through its exclusive leasing agreement, Cushman & Wakefield had a business relationship with Exchange Place. The issue is whether Schaffel's acts, through his relationship with Exchange Place, can constitute those of Exchange Place and therefore of "another employer with whom" Cushman & Wakefield had a business relationship. In resolving that issue we recognize that the exclusive leasing agreement between Cushman & Wakefield

and Exchange Place constitutes a "business relationship" between the two employers. Although the record is not clear on the precise amount of Schaffel's interest in Exchange Place, his testimony that it was "less than twenty per cent" leaves the impression that the interest, although that of a minority limited partner, was significant. Further, Schaffel's relationship to the general partner, Prudential, was sufficient for Cushman & Wakefield to fear that Barratt's complaint to the Commission could result in the loss of Exchange Place as a customer. Objectively viewed, that fear, expressed by Cushman & Wakefield's counsel on deposition, was reasonable. The facts, although not overpowering, suffice to withstand Cushman & Wakefield's motion for summary judgment.

Two considerations affect our evaluation of the facts. First, CEPA is remedial legislation, and courts should construe liberally such terms as "another employer." Second, the issue arises on Cushman & Wakefield's motion for summary judgment. Consequently, we must accord Barratt the benefit of all favorable inferences that a fact finder might draw in Barratt's favor. So viewed, we conclude that a fact finder could find that Schaffel had a sufficient interest to provide Cushman & Wakefield with the incentive to cover up wrongdoing by Schaffel.

In reaching that conclusion, we do not foreclose Cushman & Wakefield from introducing evidence of the precise amount of Schaffel's interest and activities in Exchange Place. Nor do we hold that the facts conclusively establish that Schaffel was "another employer." We recognize that in some situations the acts of a passive investor with a minimal interest in a real estate partnership need not constitute the acts of the partnership. Here, we go no further than to say that we cannot conclude as a matter of law that Schaffel was not an employer.

■ We next consider whether a business relationship will sustain an action for a retaliatory discharge if the relationship existed not at the time of the occurrence, but at the time of disclosure of the illegal act. Schaffel's conspiracy and commercial bribery occurred in 1983 at a time when he had no business

relationship with Cushman & Wakefield. In fact, at that time they were competitors. In 1990, however, when Barratt disclosed Schaffel's wrongdoing to the Commission, Schaffel had a business relationship with Cushman & Wakefield.

We hold that a business relationship at the time of the disclosure can provide the incentive for the collusion that CEPA sought to discourage. A contrary holding would provide a disincentive for an employee to report an employer's illegal or unethical conduct. It would also contravene the legislative purpose of discouraging collusion between employers. As the Assembly Statement declared, "[t]he aim of the [1989 amendments] is to discourage collusion between employers . . .," not merely provide redress for wronged employees. Assembly Labor Committee Statement No. 661, L. 1989, c. 220, § 1.

The statutory requirement that employees notify their employers and give them a reasonable opportunity to correct their unlawful conduct, N.J.S.A. 34:19-4, does not undermine Barratt's action. The purpose of that requirement, which was part of CEPA as it was originally enacted, is to provide an employer with the opportunity to correct illegal or unethical activities. We doubt that the Legislature intended that N.J.S.A. 34:19-4 would bar a retaliatory discharge action under the 1989 amendments for an act committed by another employer at a time when the discharging employer did not correct it. Finally, Barratt notified Cushman & Wakefield of his intent to complain to the Commission. Giving Barratt the benefit of all favorable inferences, that notification would satisfy the statute.

■ We likewise reject Cushman & Wakefield's argument that CEPA does not apply to Barratt's claim because it does not implicate the public interest. To reject that claim, we need not plumb the depths of the differences between common-law and statutory retaliatory-discharge actions. Nor need we resolve whether CEPA requires that the discharge affect the public interest. Here, the effect on the public interest is apparent.

Real estate brokerage is heavily regulated. *N.J.S.A.* 45:15–1 to –29.5; *N.J.A.C.* 11:5–1.1 to –6.19. Schaffel's conduct, which led to the imposition of an administrative penalty of $1,000, reflects adversely on all brokers. If unredressed, unethical or illegal conduct could lead others astray and subvert public confidence in real estate brokers. To protect the public, the Commission licenses brokers, investigates complaints of misconduct, and conducts disciplinary proceedings. Statutes and administrative regulations, moreover, are precisely the mandates of public policy that will support an action for wrongful discharge. *Pierce, supra,* 84 *N.J.* at 72, 417 *A.*2d 505.

We find distinguishable two cases cited by Cushman & Wakefield: *Littman v. Firestone Tire & Rubber Co.,* 715 *F.Supp.* 90 (S.D.N.Y.1989), and *Foley v. Interactive Data Corp.,* 47 *Cal.*3d 654, 254 *Cal.Rptr.* 211, 765 *P.*2d 373 (1988). In *Littman,* the court granted the employer's motion for summary judgment because the employee "failed to adduce any evidence to demonstrate a *prima facie* case that his whistle-blowing may have played a part in the decision to fire him." 715 *F.Supp.* at 92. The court stated in *dicta* that the employer's conduct did not violate CEPA because the conduct affected only the employer and its shareholders, not the public. *Id.* at 93. For similar reasons, the California Supreme Court in *Foley* found no violation of public policy arising from the discharge of an employee who warned his employer that his supervisor had been indicted for fraud. The court ruled that the disclosure served not the public, but "only the private interest of the employer." 254 *Cal.Rptr.* at 218, 765 *P.*2d at 380. For reasons previously stated, Schaffel's conduct was adverse to the public interest in regulating the activities of real estate brokers. Hence, both *Littman* and *Foley* are distinguishable on their facts.

Contrary to Cushman & Wakefield's contentions, we believe that CEPA protects more than the disclosure of illegal acts that are ongoing. To require employees to confirm that the illegal conduct was ongoing would inhibit them from reporting that

conduct. Disclosure of illegal conduct that is past, moreover, like that of ongoing conduct, can be in the public interest.

The Appellate Division directed a limited remand on the award of attorneys' fees, including the fees awarded for the breach of the employment contract. Cushman & Wakefield argues that the award of fees under that contract is separate from the award under CEPA and LAD. We recognize the technical correctness of that argument. See *Young v. Schering Corp.*, 141 *N.J.* 16, 29, 660 *A.*2d 1153 (1995) (holding statutory waiver of common-law wrongful-discharge claim did not affect waiver of employee's contractual claims). We believe, however, that the fairer and more reasonable result is to permit the Law Division to reconsider the award after the determination of Barratt's CEPA claim. Conceivably, Cushman & Wakefield could prevail on the contract claim, but not on the CEPA claim. We do not suggest that such a result is appropriate, only that it is possible. Under the circumstances, we believe that the more prudent decision is to defer the award of fees until after the resolution of the CEPA claim.

The judgment of the Appellate Division is affirmed, and the matter is remanded to the Law Division.

*For affirmance and remandment*—Chief Justice WILENTZ, and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN, and COLEMAN—7.

*Opposed*—None.