712 A.2d 693 (1998)
313 N.J. Super. 47
Theresa DEMAS, Plaintiff-Appellant,
v.
NATIONAL WESTMINSTER BANK, Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued April 28, 1998.
Decided June 24, 1998.
*694 Stephen E. Klausner, Somerville, and Thomas Toman, Brick, for plaintiff-appellant (Klausner and Hunter, attorneys; Mr. Klausner on the brief).
Robyn L. Aversa, Morristown, for defendant-respondent (Jackson, Lewis, Schnitzler and Krupman, attorneys; Ms. Aversa and John M. Nolan on the brief).
Before Judges DREIER, PAUL G. LEVY and WECKER.
The opinion of the court was delivered by WECKER, J.A.D.
Plaintiff appeals from a summary judgment dismissing her claim that she was terminated from her position as a bank teller in violation of the Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 et seq. Because we agree with the contentions of defendant National Westminster Bank (NatWest) that plaintiff's allegations, even if true, do not state a cause of action under CEPA, we affirm. However, we do so for reasons additional to those expressed by the motion judge.
Plaintiff she was employed by NatWest from April 5, 1993, until she was terminated on July 5, 1994. Plaintiff's complaint alleges that in the spring of 1994, she became aware that another employee of the bank, Richard Opong, an investment banker assigned to the same branch, was soliciting customers of the bank "in violation of bank policies, banking regulations and statutes, and the Security Exchange Act and security regulations." Plaintiff further alleges that she reported the activity to NatWest and that although it "end[ed] the illegal practice, ... [NatWest] retaliated against Plaintiff and then terminated Plaintiff based upon fabricated charges." Finally, plaintiff alleges that NatWest retaliated against her for disclosing "to her superiors, an activity, policy, or practice that the employee believed to be in violation of law, rule, regulation promulgated pursuant to law." After the parties completed discovery, defendant moved for summary judgment.
It is undisputed that Opong was in fact misusing referrals from bank employees like plaintiff. Those referrals were intended to assist Opong to sell the bank's investment products to bank customers, and were not intended for him to divert the bank's business to his own private benefit. He offered plaintiff a referral fee, or "kickback," in the event he sold his own products to a customer whom she referred. Plaintiff realized that this was improper, declined to help him, and reported it to bank personnel. Others apparently also reported Opong's conduct, and he was promptly fired. That occurred in the spring of 1994. Plaintiff alleges that after several suspicious acts by Opong, she reported the situation immediately to Angela Petty, the Hoboken branch manager. Plaintiff testified at depositions:
I mean I knew that we were not allowed to work for competing companies. And that none of the information that we came into contact with, we signed a confidentiality thing, we're not allowed to tell anybody, anybody's business under the circumstances.
At Petty's request, plaintiff completed an affidavit with respect to Opong's conduct and participated in an investigative interview with another bank employee.
In her opposition to defendant's motion, plaintiff cites additional facts which we accept for purposes of this appeal. Plaintiff concluded from Opong's unpleasant behavior toward her that he had learned about her affidavit. She claimed to be nervous and sick over the incident and informed the assistant bank manager that she did not want to work on the following Saturday, when the bank operated with a reduced staff and Opong and an employee sympathetic to him would be working. Immediately thereafter, plaintiff claims that the bank manager, Petty, began treating her "horribly," said "nasty things," and was "just very vicious to me...." Plaintiff *695 also alleges that she was overworked at her teller's job, was "spread way too thin [and] was just exhausted," and told that to Petty. According to plaintiff, Petty overworked her over the next several months and was unsympathetic to her complaints. Among other things, according to plaintiff, Petty scolded her on several occasions for "going over her head," as when plaintiff inquired of the visiting district supervisor whether she would have to testify regarding Opong in court.
Finally, according to plaintiff, at the end of June, Petty changed her work schedule. She called plaintiff into her office and told her that she could no longer have Wednesday as her regular day off. Up until that time, plaintiff had been permitted to have Wednesdays off for her music practice sessions. Specifically, Petty informed plaintiff that she would have to work on Wednesday, July 6. On Tuesday, July 5, according to plaintiff, Petty allegedly followed plaintiff into the bathroom, screaming that she had to come to work the next day. According to plaintiff, she responded to Petty as follows: "If you cannot make your point in a civilized manner, we cannot have a discussion, we just can't." In response, Petty fired her, telling her to "sell" her money, return her keys, call personnel, and give an exit interview. In addition, Petty told her to "get the hell out" and called her a "troublemaker." While plaintiff and defendant dispute whether she was actually terminated at that time or not, we accept for purposes of this appeal plaintiff's representation that she was indeed terminated on that day.
Plaintiff alleges another incident prior to Opong's firing, an incident not the subject of her complaint, when she reported thefts by another teller. That teller was promptly fired. Plaintiff contends that Petty also scolded her on that occasion for reporting the thefts directly to security without notifying Petty first, thereby making her look bad. Clearly one of plaintiff's themes is that the bank manager harassed and retaliated against her for making her "look bad."
In dismissing plaintiff's complaint on summary judgment, the motion judge said that he had
read these papers and in fact read the deposition excerpts of the plaintiff [and others] looking for something that I thought would make a connection between Mr. Opong[1] and the situation with him and her discharge or alleged discharge in July of that same year. And frankly I can't find it. I don't see a question of fact in this case thatthat should go to a jury. I don't see how a reasonable jury could find that this plaintiff was fired by Nat West because of whatof her blowing the whistle, so to speak, on Mr. Opong. I just don't see thedon't see the connection.
Sheafter she and the other employee gave their affidavits as to what Mr. Opong had done, he was fired by the bank. Clearly what he was doing violated bank policy. I don't know whether it would violate the law or not and I'm notthat's not important for my decision. I don't see that her firing was in any way related to whatwhat she did in connection with Mr. Opong.
Now Ms. Petty perhaps didn't like the way the plaintiff went and talked to people over her head but certainly that didn't mean that Ms. Petty disagreed with her blowing the whistle on Mr. Opong and on the other people who wereor person who was apparently stealing from fellow tellers. It's possible that Ms. Petty didn't like Ms. Demas' technique, so to speak, but to say that she was discharged in retaliation for blowing the whistle on somebody and pursuant to this statute, I can't see it, and I'm granting the motion for summary judgment.
Our careful review of the record and the arguments submitted, in light of applicable law, satisfies us that plaintiff has not established a prima facie case under CEPA. In the first instance, just as in Higgins v. Pascack Valley Hospital, 307 N.J.Super. 277, 704 A.2d 988 (App.Div.1998), the conduct upon which plaintiff alleges she blew the whistle was not conduct attributable to her employer. In the second instance, she has *696 not enunciated any statute, regulation, or clear mandate of public policy that Opong's behavior violated, nor any public (as opposed to private) harm threatened thereby. The "whistleblower" statute, as CEPA is commonly referred to, provides as follows:
An employer shall not take any retaliatory action against an employee because the employee does any of the following:
a. Discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer or another employer, with whom there is a business relationship, that the employee reasonably believes is in violation of a law, or a rule or regulation promulgated pursuant to law, or, in the case of an employee who is a licensed or certified health care professional, reasonably believes constitutes improper quality of patient care;.... or
c. Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes:
(1) is in violation of a law, or a rule or regulation promulgated pursuant to law or, if the employee is a licensed or certified health care professional, constitutes improper quality of patient care;
(2) if fraudulent or criminal; or
(3) is incompatible with a clear mandate or public policy concerning the public health, safety or welfare or protection of the environment.

[N.J.S.A. 34:19-3 (emphasis added) ]
It is plain under N.J.S.A. 34:19-3 that it is only retaliation by "an employer" that is prohibited. N.J.S.A. 34:19-2(a) defines employer as follows:
a. "Employer" means any individual, partnership, association, corporation or any person or group of persons acting directly or indirectly on behalf of or in the interest of an employer with the employer's consent and shall include all branches of State Government, or the several counties and municipalities thereof, or any other political subdivision of the State, or a school district, or any special district, or any authority, commission, or board or any other agency or instrumentality thereof.
Clearly a corporate employer can act only through the conduct of its employees. However, not all conduct on the part of every employee constitutes conduct of the employer. That is a basic principal of agency law. As we noted in Higgins, only if a supervisory employee were to condone and ratify a non-supervisory employee's illegal activity could such activity be deemed that of the employer. 307 N.J.Super. at 296, 704 A.2d 988. Plaintiff's reliance upon Barratt v. Cushman & Wakefield of New Jersey, Inc., 144 N.J. 120, 675 A.2d 1094 (1996), is unavailing. There the Supreme Court found defendant liable for retaliating against a broker who reported the illegal conduct of another broker "with whom there was a business relationship." Opong cannot under any theory be deemed "another employer," as was the other broker in Barratt.
Another reason for affirming the decision below, as defendant contends, is that plaintiff has never been able to cite a specific statute, regulation, or public policy violated by Opong's behavior. This failure goes to the heart of the CEPA cause of action. See Mehlman v. Mobil Oil Corp., 153 N.J. 163, 187-88, 707 A.2d 1000 (1998):
The specific applications of the CEPA cause of action continue to evolve. But the core value that infuses CEPA is the legislative determination to protect from retaliatory discharge those employees who, "believing that the public interest overrides the interest of the organization [they] serve [ ], publicly `blow[ ]the whistle' [because] the organization is involved in corrupt, illegal, fraudulent or harmful activity." We look generally to the federal and state constitutions, statutes, administrative rules and decisions, judicial decisions, and professional codes of ethics to inform our determination whether specific corrupt, illegal, fraudulent or harmful activity violates a clear mandate of public policy, but those sources are not necessarily exclusive. A salutary limited principle is that the offensive activity must pose a threat of public harm, not merely private harm or harm only to the aggrieved employee.

[Citations omitted.]
*697 See also MacDougall v. Weichert, 144 N.J. 380, 392, 677 A.2d 162 (1996):
A vague, controversial, unsettled, and otherwise problematic public policy does not constitute a clear mandate. Its alleged violation will not sustain a wrongful discharge cause of action.
As we said in Fineman v. N.J. Dep't Human Services, 272 N.J.Super. 606, 620, 640 A.2d 1161 (App.Div.) certif. denied, 138 N.J. 267, 649 A.2d 1287 (1994):
Where, as here, action is brought under N.J.S.A. 34:19-3c(1) and (3), the judge must first find and enunciate the specific terms of a statute or regulation, or the clear expression of public policy, which would be violated if the facts as alleged are true. When the judge has, as a matter of law, identified such a statute, regulation, or other clear source of expression of public policy, the matter may then go to the jury for determination of any disputed questions of fact, and for a finding as to whether there has been a retaliatory action against the at-will employee for either objecting to or refusing to participate in activity reasonably and objectively believed (1) to violate a statute or regulation or, (2) to be incompatible with a "clear mandate of public policy."
What is absolutely plain on the facts of this case is that the conduct of Opong that plaintiff reported, and that she claims was the basis for a retaliatory termination, was conduct that harmed only NatWest's private business and was not a source of any but the most indirect harm to the public interest. In dismissing a whistleblower claim brought under New Jersey's statute, one federal district court judge said
I am convinced that the activity plaintiff believed he was exposingfraud directed solely at the company with the shareholding public only indirectly affectedis not the type of activity the statute was designed to combat, or whose disclosure the statute was designed to protect. Although the brief published legislative history of CEPA provides no explicit guidance on this point and the statutory language is seemingly all-inclusive, the entire thrust of the statute is to protect those who expose activity which hurts primarily the public. Of course, a criminal or fraudulent scheme may at times indirectly injure the corporation that becomes the instrument to execute the scheme, but the statute is concerned primarily with illegal activity which harms the public. The alleged fraud here was conducted solely against the corporation; the public was only indirectly affected....
[Littman v. Firestone Tire & Rubber Co., 715 F.Supp. 90, 93 (S.D.N.Y.1989) ]
Thus plaintiff's claim under N.J.S.A. 34:19-3(a) fails as a matter of law.
Plaintiff's attempt to bring her claim within subsection (c) of the statute is equally ineffective. She asserts without dispute that she refused to participate in Opong's improper activity. However, plaintiff tries to fit that refusal into the category of behavior protected under CEPA. Such a literal reading of the words of sub-section (c) makes no sense. See Coco Bros., Inc. v. Pierce, 741 F.2d 675, 679 (3d Cir.1984) (quoting Viacom Int'l Inc. v. Federal Communications Comm'n, 672 F.2d 1034, 1040 (2d Cir.1982)) ("[T]he surest way to misinterpret a statute or a rule is to follow its literal language without reference to its purpose.")
It is plain under Brill v. Guardian Life Ins. Co. of America, 142 N.J. 520, 540, 666 A.2d 146 (1995), that no reasonable jury could have concluded that any behavior protected by CEPA was a proximate cause of plaintiff's termination. NatWest fired Opong shortly after discovering his activity, and gave plaintiff a favorable review shortly thereafter. Whatever the reason for her termination, it was not for refusing "to participate" in Opong's activity, which she believed to be prohibited. In that respect, the motion judge's ruling on the lack of causation was correct.
In conclusion, we are satisfied that plaintiff has failed to make a case under N.J.S.A. 34:19-3(a), both because the conduct she disclosed was not that of her employer or "another employer," and because she could not cite "a law, or a rule or regulation" or even a clear mandate of public policy, violated by Opong's behavior. Plaintiff also failed to establish *698 the elements of a claim under subsection (c) of the statute for the same reason, as well as for lack of any credible evidence of causation.
We affirm.
NOTES
[1] In the transcript, the name is spelled "Opang."